505 P.2d 572

**Viola Lucille THOMPSON, and Viola Lucille Thompson as Guardian Ad Litem for Lisa Lynn Thompson and Charles Kevin Thompson, and Viola Lucille Thompson as Personal Representative of the Estate of Robert E. Thompson, Appellants,**

**v.**

**Rose BRYSON, an unmarried woman, James C. Kanelopoulos and Patricia Kanelopoulos, his wife,[1] Appellees.**

**No. 1 CA–CIV 1841.**

Court of Appeals of Arizona, Division 1, Department A.

Jan. 25, 1973.

---

1. The caption of the original complaint contained fictitious parties. The pleadings established the true names and marital status of the parties. Not all of the parties-defendant are appellees. The original trial court caption was carried over on the appeal. This Court has revised the caption to this opinion to conform to the record made in the trial court and to eliminate parties-defendant who are not parties to the appeal. The assistance of counsel in this respect will be of help to the Judges considering appellate matters.

Dunn & Alston by David R. Bailey, Phoenix, for appellants.

Renaud, Cook, Miller & Cordova, P. A., by Richmond K. Turner, Phoenix, for appellees.

STEVENS, Judge.

On 19 August 1970, one Whitmore shot and killed Robert E. Thompson in a tavern owned and operated by the appellees, the Kanelopouloses, at which time the appellee Bryson was tending bar in the tavern. The appellants are the widow and the surviving children of Thompson and as plaintiffs they sue Whitmore, Bryson and the Kanelopouloses. For convenience the latter will be hereinafter referred as the owner. The owner held the liquor license. Bryson and the owner prevailed in the trial court on their motion for summary judgment and this appeal followed. In this opinion we recite the facts in the light most favorable to the plaintiffs in their opposition to the motion for summary judgment.

The factual background is established by answers to interrogatories; the reporter's transcript of the preliminary hearing held in relation to the homicide charge filed against Whitmore; an affidavit executed by Whitmore; and the reporter's transcript of the testimony which was given by Maïer I. Tuchler, M.D., at the Superior Court hearing conducted in relation to a phase of the processing of the criminal charges filed against Whitmore. Some of the time elements recited herein are approximations.

Bryson reported for duty as the bartender at approximately 5:00 P.M. on 19 August. Thereafter, she was the only employee on duty. Business was brisk for a

time after she reported to work. Thompson arrived soon after Bryson arrived and was engaged primarily in playing pool. Whitmore, whom Bryson had never seen before, entered sometime after Thompson entered, possibly around 6:00 P. M. Apparently at sometime during the course of the evening Thompson and Whitmore played a dice game called "ship, captain and crew" for money. In a later statement to the Glendale Police, Whitmore stated that he was the predominant winner and that Thompson did not always pay off. Bryson recalled serving Whitmore two beers and two drinks of Canadian Club and water. Whitmore told the police that he consumed 10 to 15 double bourbon and waters. Bryson recalls serving Thompson four beers and one mixed drink containing three-quarters of an ounce of liquor. Neither Whitmore nor Thompson appeared to Bryson to be intoxicated at any time. Whitmore at all times appeared to be quiet and pleasant.

In the neighborhood of 9:00 or 9:30 P. M. the owner arrived and went to the roof of the building to see if he could repair the refrigeration. He did not see any of the events leading up to this tragedy. The owner's brother, who had an interest in the tavern, arrived and spent most of his time on the roof with the owner. The brother did enter the tavern from time to time.

At sometime prior to 10:00 P.M. the brother left the work on the roof and entered the tavern. Thompson was making derogatory remarks to Whitmore and slapped Whitmore with his open hand. The brother told Thompson to break it up or leave. The two shook hands and as Thompson returned to his pool game he made another derogatory remark to Whitmore. Whitmore did not give the appearance of being perturbed or upset and sometime later he quietly left the tavern.

After a lapse of possibly 30 minutes there was a screeching of brakes outside of the tavern. Shortly thereafter Whitmore entered the tavern with a shotgun, told Thompson that he was going to kill him,

then fired three shots at Thompson at close range, in rapid succession, and Thompson died from the effects thereof a short time thereafter. Immediately after firing the shots Whitmore left the tavern and placed his gun on or in his car. He did not attempt to leave and apparently offered no resistance while the brother held him for the police.

Whitmore was interrogated by a Glendale Police officer at the Glendale jail about ten minutes after midnight. The officer testified at the preliminary hearing that Whitmore appeared intoxicated; that he related a lapse of memory as to some of the events in the time interval during which he left the tavern, drove home, secured his shotgun and shells, drove back to the tavern, and reentered the tavern and shot Thompson. Whitmore told the officer that Thompson had provoked him and that he, Whitmore, felt that he had to do something about it. The officer testified that a blood-alcohol test was made at approximately 1:00 A.M. on the 20th of August, which showed a reading of .19. There was no medical evidence presented to relate that test to Whitmore and his degree of intoxication.

Whitmore made an affidavit in support of the plaintiffs' opposition to the motion for summary judgment wherein he stated, in part:

"On the evening of August 19, 1970, I was a patron of the Twin Palms Tavern from approximately 6:00 P.M. to 11:00 P.M. During that time I was served at least eight and probably ten beers and at least six and probably eight hard drinks by defendant Rose Bryson. I consumed alcoholic beverages at no other place on that date. No person other than Rose Bryson served me any alcoholic beverages at the Twin Palms Tavern.

"I became extremely intoxicated and remember very few incidents in the latter part of the evening. I do remember being served drinks by Rose Bryson after I became extremely intoxicated. It is my belief that late in the evening, after

becoming extremely intoxicated I was not aware of what I was doing, and was in this condition when I shot Robert Thompson. I would not have shot Robert Thompson had I not been in this condition. I was served drinks by Rose Bryson while in this condition."

Dr. Tuchler, in his testimony in the criminal proceeding in the Superior Court, described Whitmore as a man with an organic brain syndrome, an epileptic condition described as "an epileptic fugue state". The basis for Whitmore's brain disorder was physical and not psychological. Whitmore had asthma problems for which he used generous quantities of an inhalant containing "a combination of amphetamines and ephedrine." The drug in the inhalant when combined with the alcohol creates a toxic effect. There are other problems which created difficulties for Whitmore. Dr. Tuchler testified:

> "THE WITNESS: Yes, but given the facts that he's under intense emotional strain, that he has really feelings of, I'm sure, of anger, someone is abusing him, he's responding it's at this time that alcohol and emotions can trigger the presence of epileptic explosion."

Perhaps the most crucial element of Dr. Tuchler's testimony is that prior to his examination of Whitmore, which was conducted as an adjunct to the criminal proceedings, Whitmore was completely unaware of these many problems. It is clear from the record that the appellees, who had never seen Whitmore before the night of the tragedy, were completely unaware of the potential problem. There is no evidence to refute Bryson's testimony that when Whitmore left the tavern he appeared to be quiet, sober and unperturbed.

## THE WHITMORE AFFIDAVIT

Rule 56(e), Rules of Civil Procedure, 16 A.R.S., provides in part:

> "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show af-

firmatively that the affiant is competent to testify to the matters stated therein."

The appellees urge that the following statement contained in the Whitmore affidavit:

> "I would not have shot Robert Thompson had I not been in this condition"

should be disregarded as not qualifying for consideration under the Rule. At a trial on the merits on the issue of the liability of the appellees, had Whitmore testified as a co-defendant, possibly on cross-examination, the admissibility of such a statement by him could depend upon the preliminary foundation. We find it not necessary to decide at this point in view of the fact that this appeal is resolved on other bases.

## LIQUOR LAWS

A.R.S. § 4-244 provides, in part:

"4-244. UNLAWFUL ACTS

"It is unlawful:

*    *    *    *    *    *

"14. For a licensee or other person to serve, sell or furnish spirituous liquor to an intoxicated or disorderly person, or for a licensee or employee of the licensee to allow or permit an intoxicated or disorderly person to come into or remain on or about his premises."

Taking the evidence in the light most favorable to the position of the plaintiffs, the appellees violated this statute. Arizona has no dram shop act and has no civil damage act. In a slightly different setting [the sale of liquor to a minor which is also prohibited by another subsection of A.R.S. § 4-244] in the case of Collier v. Stamatis, 63 Ariz. 285, 162 P.2d 125 (1945), our Supreme Court stated that the purpose of the liquor laws "  *   *   *  is to regulate the business rather than to enlarge civil remedies." 63 Ariz. at 289, 162 P.2d at 127. The principal Arizona cases relating to the potential of civil liability of a tavern-owner who sells intoxicating beverages are Pratt v. Daly, 55 Ariz. 535, 104 P.2d 147 (1940); Vallentine v. Azar, 8 Ariz.App. 247, 445 P.2d 449 (1968); and Pierce v.

Lopez, 16 Ariz.App. 54, 490 P.2d 1182 (1971).

■ Assuming for the purpose of this opinion that Whitmore was intoxicated at the time the last drink was served to him and prior to the time that he left the tavern, we hold that the sale under those circumstances did not create, by virtue of a violation of the statute, a presumption of liability.

## STATUTORY PRESUMPTION

■ Until recently the statutory provision that a specified blood-alcohol content created a presumption that a person was "under the influence of intoxicating liquor" was placed at the level of .15. The case of Mattingly v. Eisenberg, 79 Ariz. 135, 285 P.2d 174 (1955), a case where the driver had a blood-alcohol content of .238, established that the statutory presumption did not apply to a civil action arising out of the driving of a motor vehicle. It was not until 1969 that A.R.S. § 28–692 was amended to permit the statutory presumption to apply to civil actions and then only if the civil action arose out of the driving of a motor vehicle. The term "under the influence of intoxicating liquor", found in A.R.S. § 28–692 is not synonymous with "intoxicated" found in A.R.S. § 4–244. In considering A.R.S. § 28–692 our Supreme Court stated in Davis v. Waters, 103 Ariz. 87, 436 P.2d 906 (1968):

"We believe it does not follow that merely because a person has been drinking alcoholic beverage that the person was driving under the influence of intoxicating liquor. Noland v. Wootan, 102 Ariz. 192, 427 P.2d 143 (1967) [Additional citations omitted]. In Noland v. Wootan, supra, we restated the rule in this state that a person is driving under the influence of intoxicants if his control of his vehicle is to the *slightest degree affected* by his consumption of the intoxicant. (Emphasis Theirs)." 103 Ariz. at 90, 436 P.2d at 909.

■ We hold that it is the established law in Arizona that the sale of an alcoholic beverage by a liquor dispenser to a person who is then intoxicated does not, and of itself, create a civil liability on the part of the liquor dispenser for injuries sustained by a third person at the hands of the intoxicated consumer of the alcoholic beverage.

In accord with this view are Hamm v. Carson City Nugget, Inc., 85 Nev. 99, 450 P.2d 358 (1969) and Hull v. Rund, 150 Colo. 425, 374 P.2d 351 (1962). The Supreme Court of California in Vesely v. Sager, 5 Cal.3d 153, 95 Cal.Rptr. 623, 486 P.2d 151 (1971), reached a different conclusion when considering a statute similar to our A.R.S. § 4–244 combined with a general California statute relating to the civil legal effect of statutory violations.

## PROXIMATE CAUSE

■ Assuming, but expressly not deciding, that a jury could have found that the appellees were negligent in selling alcoholic beverages to Whitmore in point of time shortly before he left the tavern around 10:00 in the evening, the question remains as to whether such negligence could be a proximate cause of Thompson's death. There must be both a duty and proximate cause. Pierce v. Lopez, supra. An essential element to consider is the aspect of foreseeability. West v. Cruz, 75 Ariz. 13, 251 P.2d 311 (1952) and Tucker v. Collar, 79 Ariz. 141, 285 P.2d 178 (1955). In Parsons v. Smithey, 109 Ariz. 49, 504 P.2d 1272 (decided January 9, 1973) our Supreme Court cited Tucker, supra, and stated "[i]t is the law of this state that a defendant should never be held for consequences which no reasonable man would expect to follow from his conduct." The Supreme Court concluded its opinion stating "[b]ut we adhere to the rule of negligence holding that liability must be commensurate with the foreseeable risk."

Under the very unusual circumstances surrounding this case, we hold as a matter of law that the element of foreseeability was absent and that even had the jury found negligence on the part of the appel-

lees in selling intoxicating beverage to Whitmore for his own ingestion the element of proximate cause could not have been established.

The judgment is affirmed.

DONOFRIO, P. J., and EUBANK, J., concur.